# ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2013 JAN 18 PM 12 00

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

|  |  |  |
|---|---|---|
| WAYMON GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 311-023 |
| | ) | |
| ROBERT ROSIER, Warden, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

At the time of the events giving rise to the above-captioned case brought pursuant to 42 U.S.C. § 1983, Plaintiff was an inmate incarcerated at the Wheeler Correctional Facility ("WCF") in Alamo, Georgia. Plaintiff is proceeding *pro se* and *in forma pauperis* in this case, which is now before the Court on Defendants' motion for summary judgment. (Doc. no. 35.) Plaintiff filed a response to Defendants' motion, along with two separate statements of material facts and an affidavit. (Doc. nos. 40, 41, 42, 43.) Each of Plaintiff's statements of material facts contains various attachments, including documents relating to Plaintiff's medical issues and care, his transfers between prisons, and his prison grievances. (See generally doc. nos. 41, 42.) For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** (doc. no. 35), that a final judgment be **ENTERED** in favor of Defendants, and that this civil action be **CLOSED**.

## I.    FACTS

Plaintiff was incarcerated at WCF from August 23, 2007, until April 8, 2010, at which point he was transferred to Hays State Prison ("HSP") in Trion, Georgia. (Doc. no. 35-1, pp. 11-12.) Plaintiff was subsequently transferred amongst a number of other prisons, and remains currently incarcerated at Phillips State Prison in Buford, Georgia, following his transfer there on January 24, 2012. (Id. at 11.) Defendant Lane was employed as a corrections officer at WCF during Plaintiff's incarceration at the facility, and worked in the unit to which Plaintiff was assigned. (Doc. no. 35-1, Ex. B (hereinafter "Lane Aff."), ¶ 2.) Defendant Harrell was also employed as a corrections officer at WCF during Plaintiff's incarceration there, and worked with Defendant Lane in the unit to which Plaintiff was assigned. (Doc. no. 35-1, Ex. F (hereinafter "Harrell Aff."), ¶ 2.) Defendant Rosier was employed as an Assistant Warden for Security at WCF during Plaintiff's incarceration there, although he has since left prison employment. (Doc. no. 35-1, Ex. A (hereinafter "Rosier Aff."), ¶ 2.)

Notably, although Plaintiff's complaint was filed on March 23, 2011, he signed and dated the complaint on February 24, 2011. (Doc. no. 1, p. 11.) In the complaint, as in his affidavit, Plaintiff asserts a number of claims against the remaining Defendants.[1]    In particular, Plaintiff asserts that Defendant Lane acted with deliberate indifference to his safety by loudly calling him a "snitch" in front of other inmates; that Defendant Harrell, in spite of Plaintiff's articulated fear for his own safety following his encounter with Defendant

---

[1] WCF and Ralph Kemp, the Warden of WCF at the time of Plaintiff's incarceration, were both dismissed following the screening of Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e) & 1915A. (See doc. no. 13.)

2

Lane, refused his requests to be transferred out of his unit or to give him a statement form that would allow him to sign himself into protective custody; and that Defendant Rosier, following an assault on Plaintiff approximately two weeks later by four inmates with weapons, threatened to transfer Plaintiff "somewhere else" – such that he would not be able undergo surgery to repair his eye – unless Plaintiff dropped the grievance that he filed concerning the assault. (See doc. no. 1, pp. 6-10; doc. no. 43 (hereinafter "Pl.'s Aff."), ¶¶ 6-11.)

### A. Facts Related to Plaintiff's Claims Against Defendants Lane and Harrell

Plaintiff asserts that, on December 24, 2009, Defendant Lane entered his unit and loudly stated that Plaintiff was a "snitch," and that Plaintiff, while in segregation, had been caught with some "black x miles" that he had received from Defendant Lane.[2] (Doc. no. 1, p. 6; Pl.'s Aff., ¶¶ 6, 8.) In his affidavit, Plaintiff clarifies that, contrary to the Court's interpretation of his complaint in its screening, he was *not*, in fact, caught with any Black Miles, but that Defendant Lane simply incorrectly said that he was. (Id. ¶¶ 8-9.) Defendant Lane asserts that she never called Plaintiff a snitch in his unit and never told anyone that he had received contraband materials from her. (Lane Aff., ¶ 4.)

Plaintiff asserts that, following his encounter with Defendant Lane, he felt that he was in physical danger and accordingly requested on December 28 and December 29, 2009, that Defendant Harrell transfer him out of the unit in which he was then housed. (Doc. no. 1, p. 6.) Plaintiff asserts that, after Defendant Harrell refused his oral requests for transfer, he made the same request to Henry Wright, the Unit Manager of Plaintiff's unit, who Plaintiff

---

[2]Defendants explain in their motion that "Black Miles" are contraband cigars.

asserts directed Defendant Harrell to transfer Plaintiff. (Id.) Plaintiff asserts that Defendant Harrell continued to refuse to make the transfer, and that, on December 30, 2009, Plaintiff "decided to take matters into [his] own hands and move [himself]" by gathering his property and moving to segregation. (Id. at 6-7.) Plaintiff asserts that Defendant Harrell told him that if he attempted to do so she would see to it that he did not return to the unit that he was presently in, and that she additionally denied Plaintiff's subsequent request for a statement form that would allow him to sign himself into protective custody. (Doc. no. 1, p. 7; Pl.'s Aff., ¶ 10.) Defendant Harrell and Mr. Wright both assert that Plaintiff never told them that he felt threatened or unsafe for any reason or that he requested to be transferred or moved to protective custody. (Harrell Aff., ¶ 4; Doc. no. 35-1 (hereinafter "Wright Aff."), ¶ 3.) Defendant Harrell states that, had Plaintiff made such comments, she would have sent Plaintiff to the correctional counselor or unit manager, and additionally notes that, regardless, she would have been unable to transfer Plaintiff herself. (Harrell Aff., ¶ 4.) Mr. Wright likewise states that, had Plaintiff informed him that he felt unsafe, Mr. Wright would have directed him to comply with the protective custody policy at WCF by filling out a written statement form and identifying the source of the threat. (Wright Aff., ¶¶ 4-5.)

On January 14, 2010, Plaintiff was attacked by three inmates and sustained injuries to his face and eye area.[3] (Pl.'s Aff., ¶ 11; doc. no. 41, p. 9.) Plaintiff asserts that Defendant Harrell was present during the assault but failed to "do [her] duty," although the situation was "brought under control." (Doc. no. 1, p. 8.) Notably, as pointed out by Defendants,

---

[3]Although Plaintiff alleged in his complaint that he was assaulted by four inmates (see doc. no. 1, pp. 7-8), he now asserts in his affidavit that he was assaulted by only three inmates (Pl.'s Aff., ¶ 11).

Plaintiff has not submitted any evidence indicating that any of the three inmates heard or were aware of Defendant Lane's comment that Plaintiff was a snitch. (See doc. no. 35, p. 5.) Plaintiff does assert – without further explanation – that one of the three assailants, an inmate named "Donta Harris," was assigned to his dorm, was in a relationship with Defendant Lane, and was transferred to HSP with him on April 8, 2010. (Id. ¶ 10.) Plaintiff has submitted a number of medical documents that detail the extent of his injuries and the treatment that he received in connection to those injuries, including one evaluation that mentions the possibility of a future need for "orbital & ZMC surgery." (Doc. no. 41, p. 5.)

## B. Facts Related to Plaintiff's Grievances and Retaliation Claim Against Defendant Rosier

On February 9, 2010, nearly a month later, Plaintiff filed an informal grievance that the Court presumes concerned the foregoing events.[4] (Doc. no. 42, p. 2.) Plaintiff asserts that he was then placed in segregation pending an investigation of Defendant Lane based on that grievance. (Doc. no. 40, p. 4.) Plaintiff next asserts that, on the same day, he was approached by Defendant Rosier and informed that, if he did not drop his grievance, he would be transferred to another facility and not be able to receive surgery for his eye. (Doc. no. 1, p. 9; doc. no. 40, p. 5.) Defendant Rosier does not recall such a conversation, but does remember Plaintiff "complaining he wanted the people who attacked him prosecuted."

---

[4]The copy of the informal grievance that Plaintiff has submitted appears to be missing a page, such that it is unclear whether or not the description of the incident extends through the assault and his allegations against Defendants Harrell and Lane. (Doc. no. 42, p. 2.) However, given Plaintiff's description of his grievance, as well as Defendant's apparent agreement with that description, the Court assumes for purposes of analysis that Plaintiff's informal grievance did, in fact, concern the events recounted in his complaint here and his claims against Defendants Lane and Harrell. (See doc. no. 40, p. 5; doc. no. 1, p. 8; doc. no. 35, p. 9.)

(Rosier Aff., ¶ 7.) Defendant Rosier asserts that, given Plaintiff's complaints, he would have told Plaintiff that criminal prosecution was the responsibility of the District Attorney and that neither Defendant Rosier nor Plaintiff had any control over the matter. (Id.) Defendant Rosier further asserts that, had Plaintiff asked about medical procedures, he would have told him that WCF staff had no control over an inmate's medical treatment following that inmate's transfer to another prison. (Id.)

Although a copy has not been provided, Plaintiff apparently filed a second grievance on February 20, 2010, this time "complaining that he talked with [Defendant Rosier] about prosecuting the attackers and [Defendant Rosier] told him that he could not and that the DA might not either."[5] (Id. ¶ 8.) On March 7, 2010, Plaintiff filed what appears to be a formal grievance following the unsatisfactory resolution of the February 20th informal grievance, in which he asserts that WCF was responsible for his injuries and that WCF should accordingly file criminal charges against the inmates who assaulted him. (Doc. no. 35-1, p. 10.) Plaintiff also alleges in that grievance that he told Defendant Harrell that his life was in danger and that Defendant Lane told other inmates that Plaintiff was a snitch. (Id.) Two days later, on March 9, 2010, Plaintiff filed a request to drop the March 7th grievance, checking the box for "I have simply lost interest in this grievance."[6] (Id. at 9.) Notably, and

---

[5] Although Defendant Rosier notes that Plaintiff's second grievance was filed two days after "the incident on February 18, 2010" (see Rosier Aff., ¶ 8) – a reference that is echoed in Defendants' motion for summary judgment (see doc. no. 35, p. 9) – it is unclear from the complaint or any other submission to which incident he refers.

[6] The Court notes that there is some confusion as to the sequence in which Plaintiff's grievances were filed and dropped. Specifically, although Defendants refer to a February 20, 2010 informal grievance concerning Plaintiff's wish to prosecute his attackers, that grievance has not been provided by either party. (Doc. no. 35, p 9.) Moreover, although Plaintiff's

without any clear explanation of the mechanism by which he did so from either party, Plaintiff dropped his February 9th grievance on the same day.[7] (See doc. no. 42, p. 2.)

Plaintiff asserts that he spoke with "Counselor Smith" on March 9, 2010, and that Counselor Smith told him that he had heard that Plaintiff planned to drop his grievance and informed him that he did not have to do so. (Doc. no. 40, p. 5.) Plaintiff additionally asserts that he asked Counselor Smith whether he could refile his grievance in the event that he dropped it and was subsequently transferred, and that Counselor Smith answered affirmatively. (Id. at 5-6.) Plaintiff asserts that, on March 17, 2010, he was told the same thing by "Mrs. Evans," a grievance coordinator at WCF. (Id. at 6.)

On April 8, 2010, approximately one month after Plaintiff dropped his grievance, Plaintiff was transferred to HSP.[8] (Doc. no. 35-1, p. 11.) In connection with that transfer,

_____

request to drop his grievance refers explicitly to the March 7th grievance as the one being dropped, he appears to have dropped the February 9th grievance on the same day. (See doc. no. 42, p. 2.)

While the connection between the grievances and the request to drop a grievance is not altogether clear from Defendants' description or from the grievances themselves, the relevant facts are that Plaintiff filed two grievances that concerned – at least to some extent – his assault and his allegations against Defendants Lane and Harrell, and that he dropped both grievances on March 9, 2010. Critically, the muddled nature of the processes by which Plaintiff's grievances were filed and subsequently dropped does not alter the Court's analysis of Defendants' motion for summary judgment, as explained infra.

[7]Plaintiff explicitly notes that he filed a grievance on February 9, 2010, and dropped that grievance on March 9, 2010, without making any reference to his February 20 or March 7, 2010 grievances. (Doc. no. 40, p. 5.)

[8]Notably, Defendants are incorrect in their assertion that Plaintiff was transferred to HSP on March 10, 2010. (Doc. no. 35, p. 11.) In fact, according to Plaintiff's movement history, which Defendants themselves provided, Plaintiff was simply moved to a different location within WCF on March 10, 2010, and not transferred to HSP until April 8, 2010. (See doc. no. 35-1, p. 11.)

Plaintiff vaguely asserts that Defendant Rosier "promised that [Plaintiff] would see [inmate Harris] again," but, aside from asserting that he was transferred to HSP on the same bus as inmate Harris, does not provide any additional details concerning that comment. (Pl.'s Aff., ¶ 10.) Importantly, Plaintiff has not provided any evidence showing that he has submitted any grievances related to his claims against Defendants Lane and Harrell after his transfer from WCF and before he filed the instant lawsuit. As to Plaintiff's claim against Defendant Rosier, Plaintiff does note that he filed an informal grievance against Defendant Rosier on February 24, 2011 (doc. no. 40, p. 6), and has provided a copy of that grievance in one of his statements of fact (doc. no. 42, p. 3). In the grievance, Plaintiff asserts that he continues to suffer from vision loss and nerve damage stemming from the assault in January of 2010 at WCF, and requests that Defendant Rosier "stand up to his promise" to see that the Corrections Corporation of America ("CCA") "take[s] care of [Plaintiff's] eye and all [his] medical needs." (Id.)

Plaintiff has also provided a form entitled "Statement Request for Grievance Proceeding," which shows that a request for a statement concerning Plaintiff's February 24, 2011 informal grievance was sent to Defendant Rosier on March 14, 2011. (Id. at 6.) Plaintiff has additionally provided a copy of Defendant Rosier's response to that request, which is also dated March 14, 2011. (Id. at 7.) Plaintiff's complaint was filed on March 23, 2011, although it was notably signed and dated on February 24, 2011, the same day that Plaintiff filed his informal grievance. (See doc. no. 1, p. 11.) Plaintiff has provided further documentation showing that, on April 6, 2011, he submitted a letter to "Mr. John Paul" inquiring as to the status of his informal grievance, and was told that his grievance had been

forwarded to WCF for a response. (Doc. no. 42, p. 4.) Next, Plaintiff has provided a witness statement that he made on May 3, 2011, in which he restates his allegation that Defendant Rosier promised to see that CCA would take care of his medical needs and also alleges – for the first time – that Defendant Rosier threatened to transfer him if he did not drop his grievance. (Id. at 5, 9.) In that statement, Plaintiff also mentions that various unidentified officers that were present at the January 2010 assault failed to immediately respond when the assault began. (Id. at 9.) Plaintiff's informal grievance was closed on May 10, 2011, and marked as unresolved. (Id. at 3.)

## II. DISCUSSION

As noted above, Plaintiff argues that Defendant Lane acted with deliberate indifference to his safety by audibly calling him a snitch in front of other inmates; that Defendant Harrell acted with deliberate indifference to his safety by refusing his request to be transferred from his unit following his encounter with Defendant Lane, and also by failing to intervene during a later assault on Plaintiff; and, finally, that Defendant Rosier retaliated against him for filing a grievance by transferring him to another prison, and additionally acted with deliberate indifference to his serious medical needs by denying him medical treatment for his eye and face. (See doc. no. 1, pp. 5-10; see generally Pl.'s Aff.) In their motion for summary judgment, Defendants dispute the merits of each of Plaintiff's claims and also assert that, entirely apart from the failure of those individual claims on the merits, Plaintiff's complaint as a whole should be dismissed because of his failure to exhaust his administrative remedies prior to filing his lawsuit. (See doc. no. 35, pp. 7-16.)

9

## A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Applicable substantive law identifies which facts are material in a given case.[9] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot

-------

[9]For purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

## B. The Administrative Grievance Process

As correctly noted by Defendants, a dispositive issue in this case is whether Plaintiff fully complied with the prison administrative grievance prior to bringing the instant lawsuit. That being the case, it will be helpful to explain the grievance procedure used in the Georgia state prison system. Section 1997e(a) of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321 (1996), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's mandatory exhaustion requirement "applies to all prisoners seeking redress for prison

circumstances or occurrences." Porter v. Nussle, 534 U.S. 516, 520 (2002). Moreover, the Court does not have discretion to waive the requirement, even if it can be shown that the grievance process is futile or inadequate. Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998).

Furthermore, the PLRA also "requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). In order to properly exhaust his claims, a prisoner must "us[e] all steps" in the administrative process; he must also comply with any administrative "deadlines and other critical procedural rules" along the way. Id. at 90 (internal quotation omitted). If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he procedurally defaults his claims. Johnson v. Meadows, 418 F.3d 1152, 1159 (11th Cir. 2005), cert. denied, 548 U.S. 925 (2006).

Also, because exhaustion of administrative remedies is a "precondition" to filing an action in federal court, the Eleventh Circuit requires prisoners to complete the administrative process before initiating suit. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (per curiam); see also Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999).[10] Finally, under the PLRA, the Court has no discretion to inquire into whether administrative remedies are "plain, speedy, [or] effective." Porter, 534 U.S. at 524; see also Alexander, 159 F.3d at 1326. Rather, under the PLRA's "strict exhaustion" requirement, administrative remedies

---

[10]Other federal circuits have similarly held that the PLRA does not allow a plaintiff to exhaust administrative remedies while his case is pending. See McKinney v. Carey, 311 F.3d 1198, 1200 (9th Cir. 2002); Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002); Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001); Jackson v. Dist. of Columbia, 254 F.3d 262, 269 (D.C. Cir. 2001); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999); Perez v. Wisconsin Dep't of Corr., 182 F.3d 532, 538 (7th Cir. 1999).

are deemed "available" whenever "'there is the possibility of at least some kind of relief.'" Johnson, 418 F.3d at 1155, 1156.

The administrative grievance procedure applicable in this case is governed by the Georgia Department of Corrections' Standard Operating Procedure ("SOP") IIB05-0001. Once an inmate has unsuccessfully attempted to resolve a complaint through discussion with the staff involved, the administrative remedies procedure commences with the filing of an informal grievance. SOP IIB05-0001 § VI(B). The inmate has ten calendar days from "the date the offender knew, or should have known, of the facts giving rise to the grievance" to file the informal grievance. SOP IIB05-0001 § VI(B)(5). The timeliness requirements of the administrative process may be waived upon a showing of good cause. See id. §§ VI(C)(2) & (D)(2). The SOP requires that an inmate be given a response to his informal grievance within ten calendar days of its receipt by the inmate's counselor; the informal grievance procedure must be completed before the inmate will be issued a formal grievance. Id. §§ VI(B)(12)-(13).

If unsatisfied with the resolution of his informal grievance, an inmate must complete a formal grievance form and return it to his counselor within five business days of his receipt of the written resolution of his informal grievance. Id. § VI(C)(2). Once the formal grievance is given to the counselor, the Warden/Superintendent has 30 calendar days to respond. Id. § VI(C)(14). If the inmate is not satisfied with the Warden's response to the formal grievance, he has five business days from the receipt of the response to file an appeal to the Office of the Commissioner; the Office of the Commissioner or his designee then has 90 calendar days after receipt of the grievance appeal to respond. Id. §§ VI(D)(2) & (5). The

grievance procedure is terminated upon the issuance of a response from the Commissioner's Office. See id. § VI(D). Notably, the SOP specifically contemplates and allows for the filing of grievances concerning facilities other than the inmate's current facility of incarceration. See id. § VI(F)(5). Having established the factual background for this case, as well as the procedures for fully exhausting the administrative remedies of the prison grievance system, the Court turns to the merits of Defendants' motion for summary judgment.

## C.    Plaintiff's Failure to Exhaust His Administrative Remedies

As an initial matter, the Court notes that Plaintiff does not directly address the exhaustion issue in his response to Defendants' motion for summary judgment. (See generally doc. no. 40.) Rather, Plaintiff briefly mentions the issue pursuant to his restatement of his claims from the complaint, wherein he again asserts that he dropped his February 9, 2010 grievance on March 9, 2010, as a result of Defendant Rosier's alleged threat to transfer him if he did not do so. (Id. at 5; see also doc nos. 42, 43.) Plaintiff also briefly references his informal grievance dated February 24, 2011, which concerns his claim that Defendant Rosier promised to see that Plaintiff was provided with certain medical treatment. (Doc. no. 42, pp. 1, 3.) Despite the cursory attention that Plaintiff has given to Defendant's assertion that he failed to exhaust his administrative remedies, the Court will address and explain the particulars of Plaintiff's failure to exhaust.

### 1.    Claims Against Defendants Lane and Harrell

Put simply, Plaintiff's claims against Defendants Lane and Harrell are unexhausted because Defendant Rosier's alleged threat – and Plaintiff's subsequent withdrawal of his grievances in response to that threat – do not excuse his failure to resume grieving the issue

following his transfer away from WCF.[11] The foregoing remains true even if the Court were to assume, simply for the sake of argument, that Plaintiff's decision to drop his grievances in response to Defendant Rosier's alleged threat excused the exhaustion requirement during Plaintiff's incarceration at WCF, since the ongoing nature of the alleged threat would have rendered administrative remedies "unavailable." Turner v. Burnside, 541 F.3d 1077, 1085 (11th Cir. 2008) (concluding that "a prison official's serious threats of substantial retaliation against an inmate for lodging or pursuing in good faith a grievance make the administrative remedy 'unavailable,' and thus lift the exhaustion requirement as to the affected parts of the process," assuming that the plaintiff inmate was actually deterred from continuing the process and that a reasonable inmate of ordinary firmness would have been so deterred).

Here, however, Plaintiff was transferred to HSP approximately one month after dropping his grievances, and should have then resumed grieving the issue in the absence of any ongoing threat of retaliation.[12] (See doc. no. 35-1, p. 11.) See Bryant v. Rich, 530 F.3d

---

[11] The Court additionally notes that Plaintiff's February 9, 2010 informal grievance concerning his claims against Defendants Lane and Harrell was untimely filed, considering that Plaintiff's conversation with Defendant Lane took place on December 24, 2009, and the assault on Plaintiff took place on January 14, 2010. Since Plaintiff knew or should have known of the facts giving rise to the grievance on, at the latest, January 14, 2010, his grievance should have been filed no later than January 24, 2010. SOP IIB05-0001 § VI(B)(5). To the extent that Plaintiff's February 18, 2010 informal grievance addressed his claims against Defendants Lane and Harrell, that grievance was also untimely filed, given its even lengthier attenuation from its subject events. (See doc. no. 35, p. 13; Rosier Aff., ¶ 8.)

[12] The Court additionally notes that, given that Plaintiff *did*, in fact, drop his grievances, and that he was not transferred from WCF until one month after doing so, Plaintiff has not shown any actual connection between Defendant Rosier's alleged threat and the subsequent transfer beyond his conclusory allegations concerning the same. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).

1368, 1379 (11th Cir. 2008) (holding that an inmate plaintiff failed to exhaust his administrative remedies where he initially discontinued grieving an issue because of a threat of retaliation, was subsequently transferred to another prison where the threat of violence was removed, and did not resume grieving the issue); see also Cole v. Sec'y Dep't of Corr., 451 F. App'x 827, 828 (11th Cir. 2011) (per curiam) (affirming the dismissal of inmate plaintiff's claim for failure to exhaust where he failed to allege the existence of any present and continuing threat preventing him from filing grievances). Although Plaintiff makes passing reference to a comment made by Defendant Rosier that Plaintiff "would see" inmate Harris, who was involved in the assault on Plaintiff, at HSP, and notes that he and inmate Harris were transferred to HSP on the same bus on April 8, 2010, that claim is entirely unsubstantiated and markedly vague. (Pl.'s Aff., ¶ 10.) Moreover, even if the Court were to interpret that comment as a legitimate threat that might serve to deter Plaintiff from filing grievances at HSP concerning the claims against Defendants Lane and Harrell, Plaintiff's movement history shows that he only remained at HSP for seven days before he was transferred to Georgia State Prison on April 15, 2010. (Doc. no. 35-1, p. 11.)

That being the case, Plaintiff had a window of approximately eleven months between the cessation of any alleged threat and the filing of his lawsuit on March 23, 2011, within which to file an out-of-time grievance concerning the claims that he attempts to assert here. Bryant, 530 F.3d at 1379 (noting that, following inmate plaintiff's transfer to a prison where the threat of retaliation was removed, plaintiff should have filed an out-of-time grievance and then shown good cause for its untimeliness). Notably, Plaintiff even asked multiple individuals at WCF whether he would be able to refile his grievances in the event that he

dropped them, and was unequivocally told on each occasion that he would be able to do so, indicating that he was fully aware that administrative remedies remained available to him after he dropped his grievances and was transferred from WCF. (Doc. no. 40, pp. 5-6.) Despite that knowledge, however, Plaintiff did not at any time revisit his claims against Defendants Lane and Harrell in grievance form or otherwise prior to filing this lawsuit. To the extent that Plaintiff's May 3, 2011 witness statement indirectly addresses his claim that Defendant Harrell failed to intervene during the January 14, 2010 assault, that statement is not a grievance itself, does not mention Defendant Harrell by name, and was made well over a month after Plaintiff initiated the instant lawsuit. (Doc. no. 42, pp. 5, 9.) In order to fully exhaust his administrative remedies, Plaintiff should have filed a new informal grievance concerning his claims against Defendants Lane and Harrell, filed a formal grievance in the event that he was not satisfied with the resolution of the informal grievance, and then, if the formal grievance was denied, appealed to the Officer of the Commissioner. See SOP IIB05-0001 §§ VI(B) and VI(C).

In sum, as Plaintiff did not comply with the prison grievance system with respect to his claims against Defendants Lane and Harrell, he has failed to exhaust his administrative remedies as to those claims prior to filing his complaint. Accordingly, Defendants Lane and Harrell are entitled to summary judgment as a matter of law on Plaintiff's claims against them for deliberate indifference to safety.

### 2. Claims Against Defendant Rosier

Plaintiff's claims against Defendant Rosier are also unexhausted, and Defendants are accordingly entitled to summary judgment on those claims as well. As an initial matter, the

Court notes that Defendants assert in their motion for summary judgment that Plaintiff's only remaining claims in this case are for deliberate indifference to safety against Defendants Lane and Harrell and for retaliation against Defendant Rosier, and have accordingly prepared their arguments in support of the motion to address only those claims. (Doc. no. 35, p. 4.) However, Defendants appear to have inadvertently omitted any mention of Plaintiff's claim for deliberate indifference to serious medical needs against Defendant Rosier, for which the Court directed service of process be issued in its September 27, 2011 Order.[13] (See doc. no. 12, p. 4.) Nevertheless, given that the Court's recommendation is that Defendants' motion for summary judgment be granted for Plaintiff's failure to exhaust his administration remedies, and that the recommendation applies equally to the overlooked claim, the Court will, in the interest of judicial economy, address that claim herein despite its omission from Defendants' motion.

Given that Plaintiff's claims against Defendant Rosier both stem directly from Defendant Rosier's alleged threat on February 10, 2010 (doc. no. 1, p. 9), Plaintiff should have filed a grievance concerning those claims no later than February 20, 2010. SOP IIB05-0001 § VI(B)(5). To the extent that Plaintiff might argue that he was not fully aware of the facts related to his retaliation claim until he was actually transferred on April 8, 2010, then

---

[13]The Court acknowledges that Defendants do briefly touch on Plaintiff's medical treatment in connection with their discussion of his claim for retaliation, although not in the context of a claim for deliberate indifference to serious medical needs: Defendants assert that, if Plaintiff had mentioned his medical treatment following a potential transfer to another prison, Defendant Rosier would have told him that neither he nor anyone else at WCF would have control over Plaintiff's medical care following such a transfer. (Doc. no. 35, p. 6.) Defendants further assert that Plaintiff's medical records were transferred along with him to his new prison assignment, and that Defendants have no knowledge as to what medical treatment Plaintiff presently requires or has received. (Id. at 7.)

18

he should have filed a grievance no later than April 28, 2010. Id. However, Plaintiff did not file a grievance relating to any attempted claims against Defendant Rosier until February 24, 2011, and has not provided any evidence demonstrating that he requested an out-of-time grievance or made the requisite showing of good cause as to the grievance's considerable untimeliness. See id. §§ VI(C)(2) & (D)(2).

Moreover, even if Plaintiff *had* filed the grievance in a timely manner or made a showing of good cause for an out-of-time grievance, the grievance that he ultimately filed does not satisfy the exhaustion requirement. First, Plaintiff's February 24, 2011 grievance makes no mention whatsoever of any retaliation claim against Defendant Rosier, and only alludes to Plaintiff's claim for deliberate indifference to his serious medical needs insofar as it describes an alleged promise by Defendant Rosier to see that the CCA would "take care of [Plaintiff's] eye and all [his] medical needs." (Doc. no. 42, p. 3.) Therefore, Plaintiff has not submitted any evidence demonstrating that he has ever filed a grievance concerning his retaliation claim against Defendant Rosier.[14] Additionally, even if Plaintiff's vague allusion to his deliberate indifference claim was sufficient to substantiate an attempt to grieve the issue – a point of which the Court is not convinced, but need not decide here – the fact remains that Plaintiff's complaint was significantly premature considering the then-current phase of the grievance process.[15] Specifically, Plaintiff was still in the informal grievance

_____

[14]Plaintiff's May 3, 2011 witness statement represents the first appearance of Plaintiff's retaliation claim in connection with a prison grievance, but it is not a grievance itself and was filed well over a month after Plaintiff initiated this lawsuit. (See doc. no. 42, p. 5.)

[15]In fact, Plaintiff's complaint is dated February 24, 2011, the same date on which his informal grievance was filed. (Compare doc. no. 1, p. 11, with doc. no. 42, p. 3.) Although

stage of the process: he had filed an informal grievance, and that grievance had been forwarded to WCF for purposes of obtaining a statement from Defendant Rosier. (Id. at 3, 6.) In order to fully exhaust his administrative remedies, Plaintiff should have awaited a reply to his informal grievance, submitted a formal grievance if dissatisfied with the resolution of the informal grievance, and then, if his formal grievance was denied, appealed to the Office of the Commissioner. See SOP IIB05-0001 §§ VI(B) and VI(C).

To the extent Plaintiff argues that, because he had yet to receive a response to his grievance at the time that he filed his lawsuit and therefore believed his grievance to have been ignored, or the system otherwise ineffective, that argument fails to exempt him from the requirement that he exhaust every step of his administrative remedies. See Alexander, 159 F.3d at 1325-26 (holding that courts do not have authority to waive grievance procedures even if they are ineffective or futile). In fact, Plaintiff's April 6, 2011 letter, which was sent approximately two weeks *after* Plaintiff filed his complaint, requested a status update as to his informal grievance and inquired as to whether the informal grievance had been forwarded to WCF, indicating that Plaintiff understood – correctly – that the investigation of his grievance was ongoing. (See doc. no. 42, p. 4.)

In sum, as Plaintiff did not comply with the prison grievance system with respect to his claims against Defendant Rosier, he has failed to exhaust his administrative remedies as to those claims prior to filing his complaint. Accordingly, Defendant Rosier is entitled to

the complaint was not actually filed until March 23, 2011, the dates listed on the complaint and grievance convincingly indicate that Plaintiff had no intention of fully exhausting his administrative remedies prior to filing his lawsuit.

summary judgment on Plaintiff's claims against him for retaliation and deliberate indifference to serious medical needs.

## III. CONCLUSION

For the foregoing reasons, the Court **REPORTS AND RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** (doc. no. 35), that a final judgment be **ENTERED** in favor of Defendants, and that this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 18th day of January, 2013, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE